Stephen J. Joncus

Oregon Bar No. 013072

JONCUS LAW P.C.

13203 SE 172nd Ave Ste 166 #344

Happy Valley, Oregon 97086

Telephone: (971) 236-1200

Facsimile: (971) 244-7997

steve@joncus.net

*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **Marc Thielman; Ben Edtl; Janice Dysinger; Don Powers; Sandra Nelson; Chuck Wiese; Loretta Johnson; Terry Noonkester; Steve Corderio; Jeanine Wenning; Diane Rich; Pam Lewis; Senator Dennis Linthicum**; individually and on behalf of all others similarly situated, | Case No.: 3:22-cv-1516 |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR DECLARATORY JUDGEMENT AND INJUNCTIVE RELIEF** |
| v. | |
| **Shemia Fagan,** in her official capacity as **Oregon Secretary of State; Clackamas County; Washington County; Multnomah County; Lane County; Linn County; Marion County; Jackson County; Deschutes County; Yamhill County; Douglas County; Klamath County; Coos County,** | |
| Defendants. | |

## INTRODUCTION

1.      Americans are confronted with a storm of election "anomalies" that have served to undermine the confidence of a significant percentage of the American electorate in the integrity of our free and fair elections. A citizen's vote is a fundamental expression of their First Amendment rights and as such is guaranteed equal protection under the United States Constitution.  Equal protection is a duty of local and state government agents and as such, the curiosity and vigilance of state and county election officials concerning potential election fraud must be of the highest order. Unfortunately, state and county officials have consistently demonstrated a profound lack of curiosity for investigation of glaring anomalies and have failed to alleviate the negative impact of these anomalies on the confidence of the Oregon voters.

2.      The maintenance of confidence in this one citizen, one vote system is the duty of all government election agencies.  The recent tsunami of election irregularities and the verifiable existence of proven voter fraud in multiple jurisdictions across the United States at the hands of government agencies/officials has served to create a crisis of confidence that state and local governments have a duty to address in an open, fair, and transparent manner. Since the 2020 election, Plaintiffs have worked diligently to look into local voting anomalies with the intention of determining the state of our election system. Plaintiffs would be perfectly happy if they were able to determine that

no voter fraud exists.  In simple terms, Plaintiffs have sought to ascertain whether our elections are indeed safe, secure and worthy of the full confidence of the Oregon voter.

3.      Defendants purport to want free and fair elections, and they tell us that our elections are free and fair, but their actions speak louder than words. Shockingly, the very agents of the state and county governments that swear an oath to uphold the United States Constitution have encumbered, disrupted, obstructed, and out-right denied access of the people to public records, refused to investigate findings from election canvassers, and impuned the reputation of election integrity minded citizens. These behaviors are consistent nationwide and encompass the highest levels of our Federal Government as President Biden named any citizen that "questioned the integrity of our free and fair elections is a threat to democracy."  This rhetoric from the highest levels of government creates a separation between the government and the right of all people to be secure in their thoughts, their person, and their right to exercise free speech, seek redress of grievances with their government and their right to cast their vote in full confidence and in a manner consistent with their right of self-expression without threat of being dubbed a terrorist or any other moniker of division at the hands of the government or any government official.

4.      This behavior of Defendants negatively impacts voter confidence in our elections and facilitates voter disenfranchisement. Why bother to vote if the vote is rigged? If the elections are fair, why are our officials fighting so hard to prevent the

public from verifying their fairness? If the elections are being manipulated with

phantom voters and other means, as indicated by the tsunami of voter anomalies, then

the scale of voter disenfranchisement is unprecedented by anything in our history

because every illegitimate or phantom vote cancels out a legitimate vote.

5.      We used to vote in a decentralized and transparent manner with

individual screening of persons showing up to vote. Even with less than perfect voter

rolls, people who had moved or died tend not to show up in person to vote. We now

vote using a centralized non-transparent black box using mail-in ballots with nothing

but a signature to validate the authenticity of the vote. Fraud occurred a lot under the

old system, but the methods of fraud were limited, and it was more easily detected.

Now fraud can occur in many more ways and it is very difficult to detect due to the

nature of mail-in ballots and the unverifiability of the black box computers that now

tabulate the vote.

6.      One question is: does the existence of massive examples of voter

anomalies and the refusal of state and local officials to adequately address them cause

disenfranchisement. It does. Another question is: do the barriers erected by public

officials to hide the voting process from the public cause disenfranchisement. It does.

An additional question is: does the evidence currently available indicative of vote

manipulation demonstrate likely disenfranchisement. It does.

7.      Due to the combined effect of these questions, what is happening in the Oregon and across the United States is mass voter disenfranchisement on an unprecedented scale at the hands of the government. It we do not have free and fair elections, the citizens have lost control of our country to the agents of division and fraud who are believed by millions to be actively working to suppress the free and fair expression of the citizen vote. It has happened elsewhere, such as in Venezuela, in which elections are understood not to free and fair and equal protections are not upheld. These facts have caused tens of thousands of Venezuelans to immigrate to the United States in search of a better life where they are equal participants in a free, fair, and civil voting society. President Biden recently acknowledged these facts in his recent statement in which he cited the tyranny in Venezuela and stated that deporting these freedom seeking migrants would be "irrational."

8.      Plaintiffs and all Oregonians have a constitutional right to have their ballots counted accurately, securely, and transparently so that only legally cast votes determine the winners of each contested office.

9.      Defendants each have duties to ensure that elections are held with a maximum degree of accuracy, integrity, and confidence.

**PARTIES**

10.     Marc Thielman is the former Superintendent of Alsea School District and was a candidate for the Republican nomination for Governor in 2022. Mr. Thielman is registered to vote and lives in Lane County.

11.     Ben Edtl is the founder of Free Oregon, a non-partisan public interest organization dedicated to defending and restoring civil rights in Oregon. Mr. Edtl is the Republican Candidate for State Senate District 19 which includes portions of has Clackamas, Multnomah, and Washington Counties. Mr. Edtl is registered to vote and lives in Washington County.

12.     Janice Dysinger is a long-time election integrity advocate who is registered to vote and resides in Multnomah County. Mrs. Dysinger is co-chair of the Election Integrity Committee of the Oregon Republican Party.

13.     Don Powers is a businessman and co-chair of the Election Integrity Committee of the Oregon Republican Party with Janice Dysinger. Mr. Powers is registered to vote and resides in Clackamas County.

14.     Sandra Nelson leads the non-partisan Washington County Election Integrity committee. Mrs. Nelson is the Republican Candidate for State Representative House District 27. Mrs. Nelson is registered to vote and resides in Washington County.

15.     Chuck Wiese is a retired meteorologist and airline pilot. Mr. Weise has personal experience of how vulnerable the Oregon's voting system is to people who

want to cast fraudulent ballots. Mr. Weise is registered to vote and lives in Washington County.

16.    Loretta Johnson is a registered dental hygienist who is registered to vote and lives in Douglas County. Mrs. Johnson leads the election integrity group in Douglas County.

17.    Terry Noonkester is journalist living in Douglas County. She is registered to vote, a Republican Party PCP, and a member of the election integrity group in Douglas County.

18.    Steve Corderio is a businessman who is registered to vote and resides in Marion County.

19.    Jeanine Wenning is registered to vote and resides in Linn County. She was a poll watcher during the 2022 Election whose rights were abused by election officials.

20.    Diane Rich is a businesswoman who is registered to vote and resides in Coos County. She was a candidate for County Clerk for Coos County in the May 2022 election.

21.    Pam Lewis was a candidate for Coos County Commissioner and is a leader in the Coos County election integrity group. Mrs. Lewis is registered to vote and resides in Coos County.

22.     Senator Dennis Linthicum represents Senate District 28 covering all or part of Klamath, Jackson, Lake, Deschutes, and Crook counties. Senator Linthicum is registered to vote and resides in Klamath County.

23.     Defendant Shemia Fagan is the Oregon Secretary of State. Ms. Fagan is responsible for the integrity of the election system in Oregon.

24.     Defendant Clackamas County is a county in the State of Oregon with a population of approximately 386,000 having its county seat in Oregon City.

25.     Defendant Washington County is a county in the State of Oregon with a population of approximately 551,000 having its county seat in Hillsboro, Oregon.

26.     Defendant Multnomah County is a county in the State of Oregon with a population of approximately 757,000 having its county seat in Portland, Oregon.

27.     Defendant Lane County is a county in the State of Oregon with a population of approximately 356,000 having its county seat  in Eugene, Oregon.

28.     Defendant Linn County is a county in the State of Oregon with a population of approximately 119,000 having its county seat in Albany, Oregon.

29.     Defendant Marion County is a county in the State of Oregon with a population of approximately 323,000 having its county seat in Salem, Oregon.

30.     Defendant Jackson County is a county in the State of Oregon with a population of approximately 206,000 having its county seat in Medford, Oregon.

31.     Defendant Deschutes County is a county in the State of Oregon with a population of approximately 163,000 having its county seat in Bend, Oregon.

32.     Defendant Yamhill County is a county in the State of Oregon with a population of approximately 101,000 having its county seat in McMinnville, Oregon.

33.     Defendant Douglas County is a county in the State of Oregon with a population of approximately 109,000 having its county seat in Roseburg, Oregon.

34.     Defendant Klamath County is a county in the State of Oregon with a population of approximately 67,000 having its county seat in Klamath Falls, Oregon.

35.     Defendant Coos County is a county in the State of Oregon with a population of approximately 63,000 having its county seat in Coquille, Oregon.

<u>**JURISDICTION**</u>

36.     Plaintiffs bring this action under 42 U.S.C. § 1983 to challenge government officers' violations of the United States Constitution and to seek prospective relief.

37.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action seeks to protect civil rights under the Fourteenth Amendment to the United States Constitution.

38.     This Court has personal jurisdiction over each Defendant because each Defendant is located in the State of Oregon.

## BASIS FOR THE COMPLAINT AND INJUNCTIVE RELIEF

39.     Voters in Oregon suffer from a crisis of confidence in their election system. The government at all levels appears to be working to exacerbate the crisis of confidence by their lack of transparency, security, inconsistent chains of custody, unequal enforcement and application of rules, and access to records that invite voter fraud, plus their refusal to seriously address blatant evidence of fraud. This conduct fuels a profound crisis of confidence that constitutes de facto voter suppression and disenfranchisement in violation of the United States Constitution.

40.     The harm from this voter suppression and disenfranchisement is actual and imminent. Each Plaintiff and each member of the Class of voters in Oregon has a personal stake in the outcome of this controversy. In view of the evidence pointing to actual fraud, the existence of substantial fraud is all but certain. Plaintiffs are entitled to ascertain the condition of our election systems and to seek necessary remedies so that the citizens can once again have confidence in current system of voting, so all citizens are empowered to participate knowing that their vote will count equally in the democratic process which as President Biden stated in his speech on the Soul of the Nation, "is the very foundation of our Republic."

41.     Oregon's statutory scheme for elections requires vote by mail with ballots scanned by computerized vote tallying systems.[1]

**Oregonians have been presented with widespread indicators of election fraud and anomalies that undermine confidence and drive de facto voter suppression and disenfranchisement.**

42.     The documentary 2000 Mules[2] shows, for everyone to see, illegal ballot trafficking. Individuals trafficking illegal ballots, called mules, are shown in the movie stuffing ballot boxes with multiple ballots in five states, Arizona, Georgia, Michigan, Pennsylvania, and Wisconsin. There were 2,000 mules who visited 10 or more ballot drop-boxes and 5 or more visits to a non-profit entity in the course of a day in the regions of Philadelphia, Detroit, Milwaukee, Atlanta, and Phoenix. But the problem is much bigger. If one looks for people who delivered multiple ballots to 5 or more drop-boxes in a day and visited a non-profit entity, 54,000 individuals satisfy that criteria in these same five regions. Mules were typically paid $10 per ballot.

43.     The degree of organization and planning to carry out the criminal activity revealed in the 2000 Mules documentary is immense. The movie 2000 Mules exposes a nationwide organized criminal conspiracy to manipulate the outcome of elections.

44.     The movie 2000 Mules focuses on the battleground states, but Oregon has the same, if not worse, vulnerabilities with its all mail-in voting system. The same

---

[1] ORS Chapter 254.

[2] *See* https://2000mules.com.

criminal trafficking of illegal ballots activity shown in 2000 Mules is also occurring in Oregon. An analysis by Seth Keshel shows that there are two major hubs for ballot trafficking in Oregon located in Portland and Eugene.

45.     An Oregon voter seeing the facts disclosed in 2000 Mules will understand that an organized crime syndicate is intent on stealing the results of elections. The ordinary citizen does not see that our public officials are taking appropriate action to prevent this from happening in Oregon.

46.     Capt. Seth Keshel is a former military intelligence analyst and analytics guru. He has analyzed every county in the country for evidence of election fraud. His analysis is based on historical trends and voter registration data. His analysis of Oregon shows that counties in the western half of the State show a "strong, unexplainable divergence from the trend," which is evidence of "Strong/Rampant Fraud" as illustrated in Figure 1.[3] Fraud in two Oregon counties, Jackson and Marion Counties, is so rampant that Jackson and Marion Counties are identified by Capt. Keshel among the 100 counties having the most fraud in the United States.[4]

_____

[3] Seth Keshel, *Oregon Election Analysis by Seth Keshel*, https://electionfraud20.org/seth-keshel-reports/oregon/ (last updated Feb. 8, 2022) (viewed Sept. 14, 2022).

[4] *Id*.



*Figure 1*

47.     Capt. Keshel has identified 74 major mule or harvesting rings across the country from the 2020 election.[5] Oregon has two major mule rings in Portland and Eugene as described in Capt. Keshel's analysis and shown in Figure 2. Capt. Keshel analysis is corroborated by the documentary 2000 Mules.

48.     An Oregon voter seeing the facts and analysis performed by Capt. Keshel will understand that organized criminals are actually manipulating the outcome of elections in Oregon. An Oregon voter will understand that the risk is imminent and

---

[5] Seth Keshel, *74 Harvesting and Mule Rings: Where They Were, How They Did It, And The Impact - Our Work is Now Corroborated*, https://skeshel.substack.com/p/74-harvesting-and-mule-rings-where (May 14, 2022) (viewed Sept. 14, 2022).

concrete. An Oregon voter sees that our public officials are failing to take appropriate

action to prevent this from happening in Oregon's elections.



*Figure 2*

49.     Dr. Douglas Frank is a renowned scientist and inventor who received his

PhD in Electrochemistry at UC Santa Barbara. He has authored approximately sixty

peer-reviewed scientific reports. Dr. Frank is an expert at, among other things,

analyzing large sets of numbers. Dr. Frank discovered the algorithm used by voting

machines to manipulate election results. Due his discovery, Dr. Frank can analyze a

couple of counties in a state and calculate a key. Using that key, Dr. Frank can then

predict the number of ballots recorded for each age for every county in the state at a

high degree of certainty. The key that Dr. Frank calculates for Oregon will not work in

Washington or any other state. But if he analyses a couple of counties in Washington

state, he can calculate a key and then predict the voter turnout for every other county

in the state of Washington. This evidence shows that elections are manipulated to a predetermined targe at the state level and contolled at the county level.

50.    Dr. Frank has also analyzed voter turnout in Oregon counties, including Washington County. The following graphs in Figure 3 show his results for Washington County.



*Figure 3*

51.    The Figure 3 graphs show the turnout in the 175 precincts in Washington County. For Republicans in Washington County, the turnout in every one of the 175 precincts in Washington County was approximately 82%. The correlation coefficient was 0.9948 on a scale where 1.0 represents perfect correlation. For Democrats in Washington County, the turnout in every one of the 175 precincts was approximately 84%. The correlation coefficient was 0.9963.

52.    This kind of pattern does not occur naturally—it is the result of human intervention in the tallying of votes. To have the same turnout in each of 175 precincts in Washington County be a naturally occurring phenomenon is statistically impossible.

It is like walking into a forest and finding all the trees growing in rows, equidistant apart. Such a thing is not the result of a natural process—it is the result of human intervention. Dr. Frank's results shows that Oregon elections are being manipulated by the software running in the tabulating machines, likely unbeknownst to any Defendant.

53.    The fact that each precinct in Washington County has the same turnout reveals a characteristic designed into the software to avoid detection. This nefarious software establishes a limit on turnout in each precinct to avoid the problem where too many phantom votes could be added, resulting in more votes than voters in a precinct, which would be a red flag more easily noticed by the public.

54.    An Oregon voter seeing the facts and analysis performed by Dr. Frank will understand that organized criminals are actively manipulating the vote. The ordinary citizen does not see that our public officials are taking appropriate action to prevent this from happening in Oregon's elections.

55.    Each of the computerized election tabulation systems in each county in Oregon utilizes a database to collect the results of scanning the ballots. Database software is complex software designed to allow the user to manipulate the data. The purpose of a voting system is not to manipulate data, it is to collect data. There is no reason to design a computer system for tabulating votes to have a database. Computers can easily add numbers without using database software. The use of database software

in Oregon's election systems gives nefarious actors an "easy" button for manipulating the vote.

56.     In Mesa County, Colorado, forensic backups of the election machines were made before and after two different elections. Analysis of those backups showed that, unbeknownst to the Elections Clerk, there were three databases for storing vote totals created in each of those two those elections (there is only supposed to be one database). The vote totals were altered using votes recorded from one database to populate another to change the election results.

57.     An Oregon voter learning the facts and analysis in Mesa County will understand that organized criminals have access to the voting machines and are intent on manipulating the vote. Such a voter will know that there is no way of knowing what is going on inside a computer that is tabulating votes. Determining how the nefarious manipulation is taking place requires an extreme amount of transparency such as access to and inspection of the source code, forensic imaging of the computers, and a rigorous chain of custody for ballots. The ordinary citizen does not see that our public officials are taking appropriate action to provide this transparency. Quite the opposite—Oregon voters see that our public officials are taking action to obstruct investigation and to hide the election system from public accountability.

58.     In Oregon, more people are registered to vote than are eligible to vote. An Oregon voter learning that more people voted than were registered, and there are more

people registered than are eligible to vote will understand that Oregon elections are not fair, and their vote is not being protected. The ordinary citizen does not see that our public officials are taking appropriate action to prevent this from happening again. To date, neither the Secretary of State, the Governor, nor any legislative body called for a review, investigation, or held public hearings that address citizen concerns or the anomalies uncovered.  This lack of "curiosity" denies citizens their right of redress of grievances and creates a sense of hopelessness that the sanctity of their votes will ever be protected.

59.     In Lane County, citizens assembled to investigate the voter rolls in their County. They found that there were an unusually high number of registrations at a numerous single addresses. There are 171 locations in Lane County with 8 or more voters registered to vote with that address. They found registrations tied to locations that do not exist, such as vacant lots, vacant buildings, and street corners. They found 105 registrations with no address on file. They visited 40 addresses having 8 or more voter registrations. In their survey, they found that only 40% of registrations were valid and a total of 307 invalid registrations. For example, an address on Amazon Parkway had 85 registered voters—no one lives there. A Walmart parking lot in Eugene has 12 registered voters—no one lives there.

60.     Lane County Election officials have stated on public record that they have not updated the voter rolls in over four years and have no plan to do so prior to the

2022 general election. Indeed, the opposite approach has been taken by Oregon. By law Oregon voters are to be left on the voter rolls forever.

61.     In 2021, the Oregon legislature passed House Bill 2681 which was signed into law by Governor Brown. The new law prohibits removing registered voters from the voter roll because they do not vote for any period of time. Currently, there are more registered voters in Oregon that there are people of legal voting age.

62.     Oregon's law is designed to create more phantom voters. The voter rolls will continuously expand with the names of people who have moved or have died. Just moving from one Oregon county to another creates a phantom voter. The registration in the person's former county of residence remains on the rolls and another registration is created in the person's new county of residence, making it very easy for that person to get two ballots and to vote twice.

63.     House Bill 2681 is a law designed to make election cheating easier. It creates a huge reservoir of officially sanctioned phantom voters. Criminals intent on rigging an election can find these phantom voters and cast votes on their behalf.

64.     One of the few protections to prevent fraud in mail-in voting is accurate voter rolls. With in-person voting, dead people or people who have moved out of the State, tend not to show up to vote in person on election day. While accurate voter rolls are still important for in-person voting, the requirement show up in person to cast a vote is a check against inaccuracy of the voter rolls. This check does not exist when

votes are cast by mail. Therefore, the accuracy of voter rolls listing the people who

eligible to vote is at a premium for mail-in voting to prevent votes being counted for

phantom voters. But Oregon has weakened this control by enacting a law that

intentionally reduces the accuracy of the voter rolls allowing more cheating to occur.

65.    Every phantom vote cast disenfranchises a legitimate vote. Oregon

citizens who take their vote seriously, who carefully consider the candidates, have their

precious right to take part in choosing their leaders stripped away from them illegally

and surreptitiously by criminals casting phantom votes.

66.    An Oregon voter learning of this new law and that there are more

registered voters than people in Oregon will understand that, rather than protecting

the sanctity of their vote, the politicians are trying to make the voting system as easy to

cheat as possible. An Oregon voter will understand that all of these excess ballots can

be used by criminals to cast illegitimate votes thereby stealing their vote.

67.    Also in 2021, the Oregon legislature passed House Bill 3291 which was

signed into law. The new law permits the counting of ballots received by mail up to

seven days after an election. Ballots received after election day are still counted even if

a postmark is missing. This law makes it even easier for criminals to cheat. After seeing

the results of the election as of election day, criminals now have seven more days to

mail in more phantom votes to affect the results of an election.

68.     An Oregon voter learning of this new law will understand that the politicians are trying to make the voting system as easy to cheat as possible. An Oregon voter will understand the extra seven days allows those who want to cheat more time to turn in illegitimate ballots to change the result of an election.

69.     The extraordinary number and seriousness of election anomalies, along with the lack of transparency by Defendants cause each Plaintiff and Class members a feeling of despair about the integrity of elections. Plaintiffs and many Class members feel that Defendants' lack of transparency is a sign that they are hiding the fraud. There are many Oregon citizens who feel that because the election outcome is predetermined, there is no point in voting. Voting is pointless. Because one cannot believe the results of elections, their vote has been nullified by the cheating. Because it is so easy to steal an election, it is a waste of time to vote. This is causing mass disenfranchisement.

70.     The lack of public confidence in the accuracy of Defendants' election process (mail-in voting and computerized tabulation) and their obstruction of investigation by the public disenfranchises many members of the Class. Moreover, the actual fraud in evidence disenfranchises legitimate votes.

**Instead of taking action to address the problems, public officials are covering up the problem and obstructing the public from investigating anomalies in our election system**.

71.     Tim Sippel sought an election database from Washington County in a public records request. The County told him that he could not have it. He appealed the

rejection to Washington County District Attorney who after considering the arguments on both sides, ordered Washington County to produce the database. Washington County responded with a lawsuit seeking a declaration that the County was not obligated to produce the ballot database under public record request rules. The Oregon Secretary of State intervened on the side of Washington County.

72.    Washington County uses an election system manufactured by Clear Ballot. The contract between Washington County and Clear Ballot designates the database produced by the Clear Ballot software to tally election results as wholly owned by the County, without any restrictions on its use. The contract makes it clear that the ballot database is a public record.

73.    The Washington County DA ordered the records released only to have the Oregon Secretary of State and Attorney General Ellen Rosenbaum to seek a restraining order to block the distribution of the released Data.  Attorney General stated publicly that the order was needed as the data signature could assist nefarious actors as the ballot machines are "vulnerable to attack."

74.    An Oregon voter learning these facts will wonder what Washington County, the Secretary of State, and/or the AG is trying to hide. An Oregon voter will see that instead of providing transparency on the accuracy of the election, public officials are trying hard to conceal and hide the process by which votes are tallied in

Oregon elections. An Oregon voter will know that people who behave like they have something to hide, likely have something to hide.

75.    A bench trial in the Sippel case was held in September 2022 and witnessed by a crowd of Oregon citizens. The Secretary of State sought to exclude, and managed to exclude an eminently qualified and relevant witness, Dr. Douglas Frank. The many Oregon voters in attendance viewed the Secretary of State's and Washington County's prosecution of the case as a coverup. The many Oregon voters in attendance found the reasons offered by the Secretary of State and Washington County for withholding the ballot database to be frivolous.

76.    Janice Dysinger obtained the ballot images and the cast vote record from Multnomah County for a charge of $159.62. She obtained the same from Lincoln and Clatsop, and Polk Counties for $60, $64, and $120 respectively.

77.    But word had gotten out that the ballot images, along with the cast vote record, can yield important information to check the integrity the election. All of a sudden, county election clerks are quoting astronomical charges to obtain public information. The quote from Benton County was $6,798.75. The quote from Harney County was $7,939.78. The quote from Linn County was $77,376.05. The quote from Deschutes County was $93,703.52.

78.    One county election clerk said that the Secretary of State's office told them to hold off on responding to public records requests. A Directive from the

Secretary of State's office directed county election officials to carefully screen ballot images for cases where a voter wrote their name on the ballot in the name of ballot secrecy. Of course, voters are not supposed to write their name on the ballot. If an occasional voter writes their name on a ballot, they have intentionally waived their right to secrecy. The Secretary of State elevates this purported concern for ballot secrecy of the rare person who intentionally waived their right to secrecy over the concern of the citizens who entitled to access to public records. The effect of the Secretary of State's Directive is raise the cost of obtaining ballot images two orders of magnitude, from hundreds of dollars up to a range of $50,000 to $100,000. The obvious intent of the Secretary is not to protect the rare citizen who waived their anonymity, but create a cost barrier for the public to access the public's records.

79.    Douglas County seeks to charge more than $51,000 for the ballot images from the 2020 election for a public records request made by Terry Noonkester. Mrs. Noonkester has made additional public records requests in Douglas County. But Douglas County made the arbitrary decision that it would not respond to additional public records requests from Mrs. Noonkester until she either cancelled or paid for her request for ballot images. Douglas County made this arbitrary decision without any authority under the law.

80.    An Oregon voter learning these facts will wonder what these Oregon Counties and the Secretary of State is trying to hide. An Oregon voter will see that

instead of providing transparency on the accuracy of the election, public officials are

working hard to conceal and hide the process by which votes are tallied in Oregon

elections. Public records belong to the people. But Oregon bureaucrats are keen to

resist attempts by the public to obtain these records. An Oregon voter will know that

people who behave like they have something to hide likely do have something to hide.

### Experts have been raising concerns about electronic voting systems for two decades.

81.    For two decades, experts and policymakers from across the political

spectrum have raised glaring failures with electronic voting systems.

82.    Electronic voting machines and software manufactured by industry

leaders are vulnerable to external access by nefarious actors, during, and after an

election in a manner that could alter election outcomes. These systems can be

connected to the internet or cellular networks, which provides an access point for

unauthorized manipulation of their software and data.

83.    Other countries, including France and Taiwan, have completely or largely

banned or limited the use of electronic voting machines due to the security risks they

present.

84.    In contrast, over the last two decades the United States has transitioned

from a safe, secure, auditable paper-based system to an inherently vulnerable, network-

exposed black-box electronic equipment-based system. The transition to increased

reliance on electronic systems and computer technology has created unjustified new

risks of hacking, election tampering, and electronic voting fraud. Fraud that was once

detected relatively easily and was limited in scope, can now be conducted on a large

scale in a manner that is very difficult to detect.

85.    The mantra of those who defend the current systems is that there is no

evidence of fraud. But at the same time, they fail to show the public what is happening

inside the black box machines that count the vote. There is no way of knowing what

the computer is actually doing. It is a black box executing procedures that cannot be

verified and or adequately checked. They also defend the system of mail-in voting as

un-hackable because, as they are fond of saying, you cannot hack paper. But then, the

public learned through the documentary 2000 Mules of the vast criminal enterprise

that is inserting illegal paper votes into the system in a manner designed not to be

detectable. Paper can be hacked. It is not a question of how much cash is in the cash

register—it is how much of it is counterfeit.

86.    Since 2002, elections throughout the United States have increasingly and

largely been conducted using a handful of computer-based election management

systems. These systems are created, maintained, and administered by a small number

of companies having little to no transparency to the public, producing results that are

far more difficult to audit than paper-based systems, and lack any meaningful federal

standards or security requirements beyond what individual states may choose to

certify. Leaders of both major parties have expressed concern about this lack of transparency, analysis and accountability

87.    With each passing election the unreliability of electronic voting machines has become more apparent. In light of this experience, the vote tallies reported by electronic voting machines cannot be trusted to accurately show which candidates actually received the most votes.

88.    Credible allegations of electronic voting machine errors that materially impacted specific races began to emerge in 2002. Black Box Voting, the seminal publication documenting early pitfalls of electronic voting systems, chronicles failures that include:

> In the Alabama 2002 general election, machines made by Election Systems and Software (ES&S) flipped the governor's race. Six thousand three hundred Baldwin County electronic votes mysteriously disappeared after the polls had closed and everyone had gone home. Democrat Don Siegelman's victory was handed to Republican Bob Riley, and the recount Siegelman requested was denied. Six months after the election, the vendor shrugged. 'Something happened. I don't have enough intelligence to say exactly what,' said Mark Kelley of ES&S.'

> In the 2002 general election, a computer miscount overturned the House District 11 result in Wayne County, North Carolina. Incorrect programming caused machines to skip several thousand partyline votes, both Republican and Democratic. Fixing the error turned up 5,500 more votes and reversed the election for state representative.

> Voting machines failed to tally 'yes' votes on the 2002 school bond issue in Gretna, Nebraska. This error gave the false impression that the measure had failed miserably, but it actually passed by a 2 to 1 margin. Responsibility for the errors was attributed to ES&S, the Omaha company that had provided the ballots and the machines.

In the November 2002 general election in Scurry County, Texas, poll workers got suspicious about a landslide victory for two Republican commissioner candidates. Told that a 'bad chip' was to blame, they had a new computer chip flown in and also counted the votes by hand — and found out that Democrats actually had won by wide margins, overturning the election.

89.    By 2004, explicit evidence that electronic voting machines were susceptible to intentional manipulation, and that malicious actors sought to exploit this vulnerability, became public. In that year, cyber expert Clint Curtis testified under oath before the House Judiciary Committee that he had previously been hired to create a program that would change the results of an election without leaving any trace of the change. Mr. Curtis testified that he wrote this program with ease. Mr. Curtis' testimony is available online.[6]

90.    During the next election cycle, in 2006, a team of computer scientists at Princeton University analyzed the Diebold AccuVote-TS voting machine, then one of the most widely deployed electronic voting platforms in the United States. They found, "Malicious software running on a single voting machine can steal votes with little risk of detection. The malicious software can modify all of the records, audit logs, and counters kept by the voting machine, so that even careful forensic examination of these records will find nothing amiss. . . . Anyone who has physical access to a voting machine, or to a memory card that will later be inserted into a machine, can install said

---

[6] Youtube, Rigged USA Elections Exposed, https://www.youtube.com/watch?v=JEzY2tnwExs, (Mar. 2, 2006) (viewed Oct. 7, 2022).

malicious software using a simple method that takes as little as one minute. . . .

AccuVote-TS machines are susceptible to voting machine viruses – computer viruses

that can spread malicious software automatically and invisibly from machine to

machine during normal pre- and post-election activity." The Princeton team prepared a

video demonstration showing how malware could flip votes. In the video, mock

election votes were cast in favor of George Washington by a 4 to 1 margin, but the

paper print-out that reported the results showed Benedict Arnold prevailing by a

margin of 3 to 2. Malicious vote-stealing malware was the sole reason for reallocation

of votes. The malicious software deleted itself after the election, leaving no evidence

that the voting machine was ever hijacked or any votes stolen.

91.     In 2009 Diebold sold "Premier," its electronic voting systems business

unit, which by then was known for its technical problems and unreliable security and

accuracy. The Premier intellectual property passed to Dominion in May 2010. That

intellectual property included the GEMS election management system software.

Dominion quickly incorporated GEMS into its own products and by 2011 was selling

election equipment that had updated GEMS software at its heart. But GEMS was

notorious for being, according to Harper's Magazine, "a vote rigger's dream" that

"could be hacked, remotely or on-site, using any off-the-shelf version of Microsoft

Access, and password protection was missing for supervisor function." Lack of

encryption on its audit logs "allowed any trace of vote rigging to be wiped from the

record." Computer scientists from Johns Hopkins University and Rice University found GEMS "far below even the most minimal security standards applicable in other contexts" and "unsuitable for use in a general election." These same problems exist in all voting systems available from every manufacturer.

92.    In 2015 the Brennan Center for Justice issued a report listing two and a half-pages of instances of issues with voting machines, including a 2014 investigation which found "voters in Virginia Beach observed that when they selected one candidate, the machine would register their selection for a different candidate."[7] The investigation also found that the Advanced Voting Solutions WINVote machine, which is Wi-Fi-enabled, "had serious security vulnerabilities" because wireless cards on the system could allow "an external party to access the [machine] and modify the data [on the machine] without notice from a nearby location," and "an attacker could join the wireless ad-hoc network, record voting data or inject malicious [data.]"

93.    In 2016, following in the footsteps of the Johns Hopkins, Rice, and 2006 Princeton teams, Princeton Professor of Computer Science Andrew Appel told an interviewer how he had purchased a voting machine for $82 on the internet – the Sequoia AVC Advantage, still set to be used in the 2016 election in a number of states – and replaced the machine's ROM chips in mere minutes using little more than a

---

[7] Lawrence Norden and Christopher Famighetti, *America's Voting Machines at Risk, Brennan Center for Justice*, p.13 (Sep. 15, 2014) (available at https://www.brennancenter.org/our-work/research-reports/americas-voting-machines-risk).

screwdriver, thereby "throw[ing] off the machine's results, subtly altering the tally of votes, never to betray a hint to the voter."[8]

94.    During that 2016 election cycle evidence emerged of foreign state actors seeking to affect U.S. voting. "Russian agents probed voting systems in all 50 states, and successfully breached the voter registration systems of Arizona and Illinois."[9] The Robert Mueller report and an indictment of twelve Russian agents later confirmed that Russian hackers had targeted vendors that provide election software, and Russian intelligence officers "targeted employees of [REDACTED], a voting technology company that developed software used by numerous U.S. counties to manage voter rolls, and installed malware on the company network."[10]

95.    After these revelations about the 2016 election, Jake Braun, a former security advisor for the Obama administration and organizer of the DEFCON hacking Conference was asked in 2017, "Do you believe that right now, we are in a position where the 2020 election will be hacked?" He answered, "Oh, without question. I mean the 2020 election will be hacked no matter what we do."

---

[8] Ben Wofford, *How to Hack an Election in 7 Minutes*, Politico (Aug. 5, 2016) (https://www.politico.com/magazine/story/2016/08/2016-elections-russia-hack-how-to-hack-an-election-in-seven-minutes-214144/).

[9] Jordan Wilkie, *'They think they are above the law': the firms that own America's voting system*, The Guardian (Apr. 23, 2019) (https://www.theguardian.com/us-news/2019/apr/22/us-voting-machine-private-companies-voter-registration).

[10] Robert S. Mueller, III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, vol. 1, p. 51 (Mar. 2019). (https://www.justice.gov/archives/sco/file/1373816/download).

96.    On October 11, 2020, the federal court issued an order finding substantial evidence that the system was plagued by security risks and the potential for votes to be improperly rejected or misallocated. It wrote, "The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?' – but 'when it will happen.'" Concerns in Georgia proved to be well-founded. After scanned ballot images were designated as "public records" under Georgia Senate Bill 202, a report made public by VoterGA revealed, among other things, that 17,724 votes in Fulton County were somehow counted and certified through tabulation machines, despite having no corresponding ballot images. The report further concluded that 132,284 mail-in ballot images do not have a signature file, meaning these ballots cannot be authenticated.

97.    In 2019 a group of election security experts found "nearly three dozen backend election systems in 10 states connected to the internet over the last year," including in "critical swing states" Wisconsin, Michigan, and Florida. Some of the jurisdictions "were not aware that their systems were online" and were "publicly saying that their systems were never connected to the internet because they didn't know differently.[11]

---

[11] Kim Zetter, Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials, Vice (Aug. 8, 2019) (https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials).

98.    In March 2020, the documentary Kill Chain: The Cyber War on America's

Elections detailed the vulnerability of electronic voting machines. In the film, Hursti

showed that he hacked digital election equipment to change votes back in 2005, and

said the same Dominion machine that he hacked in 2005 was slated for use in 20 states

for the 2020 election. Kill Chain also included facts about a Georgia election in which

one machine out of seven in a precinct registered a heavy majority of Republican votes,

while every other machine in the precinct registered a heavy majority of Democratic

votes. Dr. Kellie Ottoboni, Department of Statistics, UC Berkeley, stated the likelihood

of this happening by chance was less than one in a million.[12]

99.    Lawmakers and officials throughout the nation have realized these

problems with electronic voting machines cannot be ignored.

100.    In a March 21, 2018 hearing held by the Senate Intelligence Committee

relating to potential foreign interference in the 2016 election, Senator Ron Wyden

warned that:

> Forty-three percent of American voters use voting machines that
> researchers have found have serious security flaws including backdoors.
> These companies are accountable to no one. They won't answer basic
> questions about their cyber security practices and the biggest companies
> won't answer any questions at all. Five states have no paper trail and that
> means there is no way to prove the numbers the voting machines put out
> are legitimate. So much for cyber-security 101… The biggest seller of
> voting machines is doing something that violates cyber-security 101,

---

[12]

directing that you install remote-access software which would make a machine like that a magnet for fraudsters and hackers.

101.    Senator Wyden did not see his concerns addressed. On December 6, 2019, he, along with his Democratic colleagues in Congress (Senator Elizabeth Warren, Senator Amy Klobuchar, and Congressman Mark Pocan) published an open letter concerning major voting system manufacturers. In the letter, they identified numerous problems:

> "trouble-plagued companies" responsible for manufacturing and maintaining voting machines and other election administration equipment, "have long skimped on security in favor of convenience," leaving voting systems across the country "prone to security problems."

> the election technology industry has become highly concentrated ... Today, three large vendors – Election Systems & Software, Dominion, and Hart InterCivic – collectively provide voting machines and software that facilitate voting for over 90% of all eligible voters in the United States.

> Election security experts have noted for years that our nation's election systems and infrastructure are under serious threat. . . . voting machines are reportedly falling apart, across the country, as vendors neglect to innovate and improve important voting systems, putting our elections at avoidable and increased risk. . . . Moreover, even when state and local officials work on replacing antiquated machines, many continue to 'run on old software that will soon be outdated and more vulnerable to hackers.

> Jurisdictions are often caught in expensive agreements in which the same vendor both sells or leases, and repairs and maintains voting systems-leaving local officials dependent on the vendor, and the vendor with little incentive to substantially overhaul and improve its products.

102.    Senator Warren, on her website, identified an additional problem: "These vendors make little to no information publicly available on how much money they

dedicate to research and development, or to maintenance of their voting systems and technology. They also share little or no information regarding annual profits or executive compensation for their owners."

103.    During a Senate Judiciary Committee hearing in June 2018, then-Senator Kamala Harris warned that, in a demonstration for lawmakers at the Capitol, election machines were "hacked" before the lawmakers' eyes. Two months later, Senator Klobuchar stated on national television, "I'm very concerned you could have a hack that finally went through. You have 21 states that were hacked into, they didn't find out about it for a year."

104.    While chairing the House Committee on Homeland Security in July of 2018, Republican Congressman Michael McCaul decried, "Our democratic system and critical infrastructures are under attack. In 2016, Russia meddled in our Presidential election through a series of cyber attacks and information warfare. Their goals were to undermine the credibility of the outcome and sow discord and chaos among the American people. . . ."

105.    Senator Wyden stated in an interview, "[T]oday, you can have a voting machine with an open connection to the internet, which is the equivalent of stashing American ballots in the Kremlin. . . . [As] of today, what we see in terms of foreign interference in 2020 is going to make 2016 look like small potatoes. This is a national security issue! . . . The total lack of cybersecurity standards is especially troubling . . .

But the lack of cybersecurity standards leads local officials to unwittingly buy overpriced, insecure junk. Insecure junk guarantees three things: a big payday for the election-tech companies, long lines on Election Day, and other hostile foreign governments can influence the outcome of elections through hacks."

106.    However, since the 2020 election, Senator Wyden has had nothing to say about the risk of using computerized voting machines. An Oregon voter learning these facts would understand that Senator Wyden sudden silence on this issue is due to his realization that the manipulation of the vote was in favor of his party. An Oregon voter knowledgeable about this history will not have confidence in the integrity of elections where ballots are counted using computerized machines.

**Failure to use known open source software techniques**.

107.    No electronic voting system to be used in Oregon employs "open source" technology, which is electronic equipment for which the details of the components of the system, including its software, is published and publicly accessible. Election vendors refuse to use open source software, even though the technology would promote both security and transparency.

108.    Open source technology fosters transparency, which is why government agencies have employed it for well over a decade. As the U.S. Department of Defense notes on its website, the following policies apply at the federal level to promote the use of open source programs:

a.      The Federal Source Code Policy, OMB Memo 16-21, establishes policy regarding consideration of acquiring custom-developed code, requiring agencies to consider the value of publishing custom code as OSS, and establishing a OSS Pilot Program to release 20% of all custom-developed code as OSS. The DoD was later directed to implement this program by Section 875 of the National Defense Authorization Act for FY2018.

b.      The DoD CIO issued a memorandum titled "Clarifying Guidance Regarding Open Source Software (OSS)" on October 16, 2009, which superseded a memo May 2003 memo from John Stenbit.

c.      The Department of Navy CIO issued a memorandum with guidance on open source software on June 5, 2007.

d.      The Open Technology Development Roadmap was released by the office of the Deputy Under Secretary of Defense for Advanced Systems and Concepts, on June 7, 2006.

e.      The Office of Management and Budget issued a memorandum providing guidance on software acquisition which specifically addressed open source software on Jul 1, 2004.

f.      US Army Regulation 25-2, paragraph 4-6.h, provides guidance on software security controls that specifically addresses open source software.

109.    In 2016, the Obama administration "introduced a new Federal Source Code Policy that called on every agency to adopt an open source approach, create a source code inventory, and publish at least 20% of written code as open source. The administration also launched Code.gov, giving agencies a place to locate open source solutions that other departments are already using."

110.    This lack of transparency has created a "black box" system of voting which lacks credibility and transparency.

111.    Due all of the foregoing issues, Oregonians are being disenfranchised from their votes in multiple ways. Oregon voters feel a lack of confidence in the integrity of the voting system, and as a result many such voters will not exercise their right to vote due to what seems to be a hopelessly corrupt system in which their vote will not count because it will be overwhelmed by as many illegal votes as necessary to reach the desired outcome by the criminals who have infiltrated the system. The behavior of the Secretary of State and county election officials to obstruct the public's attempt to investigate the State's voting system serves to further confirm this view by Plaintiffs and members of the Class. The evidence showing existence of actual fraud disenfranchises Plaintiffs and members of the Class for each phantom vote that is tallied. The recent laws passed pave the way to make cheating even easier to accomplish. It is clear to an ordinary Oregon voter that Oregon's policy is to lower the barriers to successful cheating while at the same time raising the barriers against the

public's ability to discover evidence to substantiate the condition of Oregon's election systems.

## CLASS ACTION ALLEGATIONS

112.    Plaintiffs bring this action individually and on behalf of all others similarly situated and ask the Court to certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

113.    This action satisfies the Rule 23 requirements of numersity, commonality, typicality, adequacy, predominance, and superiority.

114.    The class is defined as all citizens of voting age entitled to vote in Oregon. This class consists of millions of people.

115.    Plaintiffs' claims are typical of the claims of the proposed Class, in that Plaintiffs, like all Class members, are entitled to vote in Oregon. Plaintiffs and all members of the Class have suffered as a result the violations of their Constitutional rights.

116.    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel with the necessary expertise and resources to prosecute a state-wide class action. Plaintiffs and their counsel do not foresee any circumstances where the interests of Plaintiffs would be adverse to those of the Class.

117.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.

118.    All members of the Class suffer as a result of a common wrong on the part of Defendants.

119.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### COUNT 1: VIOLATION OF DUE PROCESS

*(Seeking declaratory and injunctive relief against all Defendants)*

120.    Plaintiffs incorporate and reallege all paragraphs in this Complaint.

121.    The right to vote is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

122.    The fundamental right to vote encompasses the right to have that vote counted accurately.

123.    Defendants have violated Plaintiffs' and Class members' fundamental right vote by deploying voting tabulation systems that are inherently unsecure and vulnerable to manipulation and intrusion.

124.    Defendants have violated Plaintiffs' and Class members' fundamental right to vote by deploying voting tabulation systems that are subject to many

unexplained anomalies that cause Oregon voters to believe that their votes are not

protected causing disenfranchisement.

125.    Defendants have violated Plaintiffs' and Class members' fundamental

right to vote by requiring votes to be cast by mail which is an inherently unsecure and

vulnerable to manipulation method of casting votes causing an unequal tabulation of

votes treating voters differently than other similarly situated voters who cast ballots in

the same election creating severe burdens and infringements on Oregon voters.

126.    Defendants have violated Plaintiffs' and Class members' fundamental

right to vote by illegally resisting the production of public records seeking to

investigate the accuracy of the vote. The behavior of public officials creates the feeling

that these bureaucrats are hiding the fraud existing in Oregon's election system.

127.    By using an unsecure system, Defendants are subjecting voters to cast

votes through an illegal and unreliable system—a system that must be presumed to be

compromised and incapable of producing verifiable results.

128.    The scheme of mail-in voting used in Oregon violates the Due Process

Clause of the Fourteen Amendment of the United States Constitution. The Court

should enjoin Defendants' use of mail-in voting and electronic tabulating systems.

## COUNT 2: VIOLATION OF EQUAL PROTECTION

*(Seeking declaratory and injunctive relief against all Defendants)*

129.    Plaintiffs incorporate and reallege all paragraphs in this Complaint.

130.    The scheme of mail-in voting used in Oregon requiring vote by mail with computer tabulation of votes using methods and systems that inherently vulnerable and unsecure to manipulation and intrusion causes an unequal tabulation of votes treating Plaintiffs and Class members who vote differently than other, similarly situated voters who cast ballots in the same election creating severe burdens and infringements on Oregon voters.

131.    These severe burdens and infringements imposed by Oregon's scheme of mail-in voting treats Plaintiffs and Class members unequally in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

132.    These severe burdens and infringements caused by Oregon's scheme of mail-in voting are not outweighed or justified by, and are not necessary to promote, any substantial or compelling state interest that cannot be accomplished by other, less restrictive means, like conducting elections using hand counted paper ballots.

133.    The scheme of mail-in voting used in Oregon violates the Equal Protection Clause of the Fourteen Amendment of the United States Constitution. The Court should enjoin Defendants' use of mail-in voting and electronic tabulating systems.

## COUNT 3: VIOLATION OF FUNDAMENTAL RIGHT TO VOTE

*(Seeking declaratory and injunctive relief against all Defendants)*

134.    Plaintiffs incorporate and reallege all paragraphs in this Complaint.

135.    The right to vote is a fundamental right protected by the U.S.

Constitution. *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). The fundamental

right to vote encompasses the right to have that vote counted accurately. *See, e.g.,*

*United States v. Mosley*, 238 U.S. 383, 386 (1915).

136.    The scheme of mail-in voting used in Oregon violates the Plaintiffs'

fundamental right to vote. The Court should enjoin Defendants' use of mail-in voting

and electronic tabulating systems.

### COUNT 4: CIVIL ACTION FOR
### DEPRIVATION OF RIGHTS UNDER 42 U.S.C. 1983

(*Seeking declaratory and injunctive relief against all Defendants*)

137.    Plaintiffs incorporate and reallege all paragraphs in this Complaint.

138.    The foregoing violations will occur as a consequence of Defendants acting

under color of state law. Accordingly, Plaintiffs bring this cause of action for

prospective equitable relief against Defendants pursuant to 42 U.S.C. § 1983.

### COUNT 5: DECLARATORY JUDGMENT

139.    The Court has the authority pursuant to 28 U.S.C. § 2201 to issue an Order

declaring that it is unconstitutional for the State of Oregon to conduct an election in which

the votes are not accurately or securely tabulated.

140.    Because of the issues described above, the Court should issue an Order

declaring that it is unconstitutional for the State to conduct an election which relies on the

use of mail-in voting and electronic tabulating systems.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.      Enter an Order finding and declaring it unconstitutional for any public election to be conducted using any model of electronic voting system to cast or tabulate votes and enjoining the use of such systems.

2.      Enter an Order finding and declaring that Oregon's vote-by-mail system is unconstitutional and enjoin the use of vote-by-mail in Oregon.

3.      Retain jurisdiction to ensure Defendants' ongoing compliance with the foregoing Orders.

4.      Grant Plaintiffs an award of their reasonable attorneys' fees, costs, and expenses incurred in this action pursuant to 42 U.S.C. 1988.

5.      Grant Plaintiffs such further and other relief as the Court deems just.

Respectfully submitted,

Dated:  October 8, 2022          By:      s/ Stephen J. Joncus

**Stephen J. Joncus**, OSB No. 013072
Email: steve@joncus.net
JONCUS LAW P.C.
13203 SE 172nd Ave Ste 166 #344
Happy Valley, Oregon 97086
Telephone: (971) 236-1200
Facsimile: (971) 244-7997
steve@joncus.net

*Attorney for Plaintiffs*